UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Deborah A. Moscato,

                         Plaintiff,

      v.

United States of America,

                      Defendant.

**Report and Recommendation**

15-CV-1063V

## I.    INTRODUCTION

District Judge Lawrence J. Vilardo has referred this motor vehicle collision case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 27.)  Pending before the Court are cross-motions by plaintiff Deborah Moscato ("Moscato") and defendant the United States of America for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  (Dkt. Nos. 26, 29 (hereafter [26, 29]).)  Moscato contends that the rear-end nature of the collision and the absence of any mitigating factors conclusively establish defendant's liability.  Documentary evidence, in Moscato's view, shows quantitative reductions in her cervical range of motion that more than one physician has connected causally to the collision.  Moscato thus believes that she has established a "serious injury" under New York's Insurance Law.[1]  Defendant does not contest liability but argues

---

[1] New York law applies to the substantive issues here.  Moscato brings this case under the Federal Tort Claims Act ("FTCA"), codified in scattered sections of 28 U.S.C.  Under the FTCA, the United States has waived sovereign immunity "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1) (Westlaw 2018); *see also id.* § 2674 ("The United States shall be liable, respecting the provisions

that Moscato nonetheless cannot recover for several reasons. Defendant asserts that Moscato cannot establish a serious injury based on records that suggest a full recovery from a mild cervical strain that the collision might have caused. To the extent that Moscato has limitations in her cervical range of motion, defendant attributes those limitations to chronic arthritis diagnosed as far back as 10 years before the collision. Additionally, defendant argues that Moscato cannot recover for economic loss because her actual economic damages do not exceed the amount of damages that New York sets for "basic economic loss."

The Court held oral argument on December 14, 2017. For the reasons below, the Court respectfully recommends granting each party's motion in part and sending this case to a damages trial for serious injury only.

## II.    BACKGROUND

### A.  Motor Vehicle Collision of 2013

This case concerns a motor vehicle collision that occurred on March 20, 2013 around 5:16 PM, at the intersection of Niagara and Carolina Streets in the City of Buffalo. [26-2 at 2.] Moscato was stopped at a red light in one of the northbound lanes of Niagara Street. [26-7 at 3.] Driving behind her was Mark Haggerty ("Haggerty"), an agent of the United States Immigration and Customs Enforcement ("ICE") agency. Haggerty did not notice in time that traffic in front of him had stopped for the red light. [*See* 26-8 at 3.] Haggerty did not rule out cellular telephone use as a contributing factor. [*See* 26-8 at 4 ("Q. Was it a cell phone? A. Possibly.").] Haggerty's Ford

---

of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."). The collision occurred in New York, and New York has a no-fault statutory scheme that affects this case in ways that will be discussed below.

Edge hit Moscato's Nissan Rogue in a rear-end collision. [*See* 26-7 at 3 ("I felt the car jerk and I went forward in the seat and realized I had been hit.").] Haggerty was working within the scope of his employment at the time of the collision. Weather was not a factor. [26-8 at 4; 26-24 at 33.] Moscato did not need treatment at the scene. [30-1 at 8.] The collision caused $2,261.16 of damage to Moscato's car. [26-2 at 2.] Moscato was able to drive the car while repairs were pending. [26-7 at 5; 30-1 at 12.]

### B. Medical Condition and Records

Moscato did not visit a hospital or a doctor immediately after the collision. [26-7 at 5.] Moscato eventually was prescribed 800 milligrams of ibuprofen. [26-5 at 4.] Moscato explained at her deposition why she sought only massage therapy for the first three months after the collision:

> I thought with massage and taking it easy it would go away. It didn't. It got worse. And at that point, I believe it was in June, my hand weakened, my arm was tingling down into my fingers and I knew something was wrong.

[26-7 at 6–7.] Moscato has provided her own description of her collision-related injuries as follows:

> It will be claimed that the motor vehicle collision caused Deborah Moscato injury and disruption to her cervical spine the muscles, ligaments and supportive structures therein including but not limited to a whiplash injury, microscopic injury to the ligamentous facet joint capsule and myofascial tissues around the cervical spine; cervical disc herniations at C6-7 and C5-6; activation and/or aggravation of disc herniations and/or degenerative conditions present in the cervical spine; referred left shoulder/blade and arm pain; radicular symptoms and complaints; muscle spasms, fixed contracture and loss of range of motion.
>
> These injuries and symptoms have been present since the motor vehicle collision and continue today.

[26-5 at 5.] Moscato also claimed $594.30 in out-of-pocket medical expenses. [*Id.*] As for daily activities, Moscato has offered the following description of limitations that she now faces:

a. Formerly, Plaintiff attended level 2 yoga classes up until the accident. She is unable to take or perform standard yoga classes due to physical restrictions. Qualified therapeutic yoga teachers are hard to find. She had one from Buffalo Spine and Sports but they moved. Most classes are not available at times when she is not working. She misses those classes terribly.

b. Plaintiff can no longer sit on a bleacher to watch sporting events (most important being grandkids little league and soccer). She must turn her whole body to watch plays.

c. Plaintiff can no longer do yard work which includes repetitive motions (raking, pulling weeds, digging, etc.) for more than a short period of time. Before the accident she could spend the day outside doing those activities. She is unable to sit for an extended period of time in a chair that does not at least come up to her shoulders. She has developed a habit of sitting with her chin supported to take weight off of her back.

d. She is unable to ride comfortably in her husband's 2001 Jeep Wrangler for any length of time because of the jarring. The backseat does not have a high enough head rest such that she is unable to sit there at all.

e. Restriction and discomfort in checking traffic while driving. She must turn her entire body and not just her head. At times, movement will cause a stinging sensation in her neck. She is extremely careful when she merges into traffic.

f. She was forced to change her route home to avoid the merge onto the I-[1]90 at the Niagara Street entrance due to the high traffic of trucks and the quick merge.

g. Restriction and pain during meetings/events/activities which would entail her looking up to talk to someone while she is in a seated position, something that happens a great deal at work.

h. Restriction and pain during meetings/events/activities which would entail her turning to either side to speak with/or listen to someone speak.

i. She is unable to engage in prolonged extension of arms overhead, including:

i. Hair rollers

ii. Vacuuming walls, etc. above shoulder height

iii. Decorating the Christmas tree (takes 2 days now)

j. When her dog was ill, she could not lift and carry her (14 pounds) due to pain across her upper shoulders and into her neck. She needed assistance in and out of the house.

k. Her job entails using two computer screens for increased productivity and ease of transferring information. This can only be done if she keeps rotating my chair from left to right instead of moving my head. Most of the time she now has to use the one screen with multiple windows open.

l. Sitting at her desk causes tightness and pain in her neck. She must stop and do PT exercises. The neck pain will cause headaches. Since the stress level in her office is at a peak and workloads are increased the amount of daily pain that she is having has now increased.

m. Limited as to the time she can sit on the floor to play games, read etc. with her three 6-1/2 year old grandchildren.

n. She is unable to participate in bike rides of any length and outside games (driveway tennis) with her husband and grandkids.

o. She is limited as to the weight of items that she can lift. If her children have any more children she will not be able to lift them in and out of cribs, etc.

*To summarize she is limited in the amount of weight that she can lift, motion of her head from side-to-side as well as up, overhead motion of her arms, sitting with unsupported neck/head etc., all which impact her day-to-day living. This is all a result of her being rear ended at a stop light. She had none of these restrictions and required modifications to her lifestyle prior to March 10, 2013.*

[26-5 at 6–7; *see also* 26-7 at 8–10.]

The record for this case includes notations in medical records for numerical assessments of

Moscato's cervical range of motion:

| Date | Provider | Extension (70°)[2] | Flexion (80–90°) | L Lateral Bend (20–40°) | R Lateral Bend (20–40°) | L Rotate (90°) | R Rotate (90°) | Dkt. No. |
|---|---|---|---|---|---|---|---|---|
| 12/29/2014 | BSSM[3] | -10% | Full | -10% | -10% | -10% | -10% | 26-11 at 5 |
| 4/2/2014 | BSSM | -25% | Full | -10% | -10% | -10% | -10% | 26-11 at 9 |
| 2/6/2014 | BSSM | -25% | Full | -25% | -10% | -25% | -10% | 26-11 at 14 |
| 8/6/2013 | BSSM | -75% | Full | -25% | -50% | -75% | -25% | 26-11 at 78 |
| 8/16/2016 | Castiglia | -25% | -25% | N/A | N/A | 50 | 65 | 26-13 at 9 |
| 8/3/2016 | Castiglia | 45 | 60 | N/A | N/A | N/A | N/A | 26-13 at 12 |
| 10/3/2016 | Castiglia | Full | Full | Full | Full | Full | Full | 26-13 at 19 |
| 11/23/2016 | Naab | -25% | -25% | N/A | N/A | 75 | 75 | 26-13 at 20 |
| 8/26/2016 | Naab | -25% | -25% | N/A | N/A | 50 | 65 | 26-14 at 6 |
| 12/11/2013 | Hausmann | 60 | 30 | N/A | N/A | 45 | 55 | 26-15 at 3 |
| 3/20/2014 | Hausmann | 45 | 35 | N/A | N/A | 45 | 45 | 26-16 at 3 |
| 1/13/2015 | Kostek | 44 | 41 | 28 | 31 | 40 | 60 | 26-17 at 3 |
| 3/24/2015 | Kostek | 36 | 43 | 30 | 31 | 40 | 40 | 26-18 at 3 |
| 4/11/2014 | Novelli | 24 | -30% | 18 | 18 | 32 | 32 | 26-20 at 2 |
| 8/8/2016 | Novelli | 30 | 30 | 25 | 25 | 40 | 55 | 26-22 at 2 |
| 6/20/2003[4] | Kowalski | N/A | N/A | N/A | N/A | 60 | 60 | 30-2 at 2 |
| 11/23/2016 | Gross | 41 | 37 | 23 | 23 | 45 | 45 | 30-8 at 2 |
| 12/5/2016 | Leddy | 50 | 40 | N/A | N/A | 50 | 60 | 30-10 at 2 |
| 9/28/2017 | Novelli | 30 | 30 | 25 | 25 | 40 | 55 | 37-1 at 16 |

The record also indicates mild disc herniations at the C5-C6 and C6-C7 levels. [*See, e.g.*, 26-13 at 14.]

On March 1, 2015, Dr. Michael Cicchetti from BSSM wrote a letter to Moscato's counsel summarizing the records generated in his office. [26-12 at 2–4.] Dr. Cicchetti noted that Moscato

---

[2] All numbers are noted in degrees or percentages. The Court is aware that no single, universally accepted set of "normal" ranges exists across doctors and patients. These normal ranges are taken from Erik E. Swartz, R. T. Floyd, and Mike Cendoma, *Cervical Spine Functional Anatomy and the Biomechanics of Injury Due to Compressive Loading*, J. Athl. Train. 2005 Jul–Sep; 40(3): 155–161, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1250253/ (last visited Feb. 8, 2018).
[3] Buffalo Spine and Sports Medicine.
[4] This is the only examination in the record that predates the motor vehicle collision. The Court will address the significance of this examination below.

progressed from "mild limitation" in her cervical range of motion, defined as "about 25 percent restriction" in all directions, to a "minimal restriction" of approximately 10 percent in all directions. Dr. Cicchetti noted that Moscato "did have pre-existing degenerative changes within her cervical spine at the time of the accident." [26-12 at 2.] Dr. Cicchetti included the following summary and opinion in his letter:

> In summary, this is a patient who suffered a whiplash injury that was associated with radicular symptoms in the left upper extremity secondary to C6-7, C5-6 disc herniations who is unable to achieve complete resolution of symptoms with long-term conservative management.

> In my opinion this patient's whiplash injury to her cervical spine is directly related to the motor vehicle accident. Whiplash injuries do not result in macroscopic trauma to the spine such as fractures. By definition, a whiplash injury implies microscopic injury to the ligamentous, facet joint capsule and myofascial tissues around the cervical spine.

[26-12 at 3.] Dr. Steven Hausmann also believed that Moscato's cervical myofascial strain and reduced range of motion resulted from the motor vehicle collision. [26-15 at 3; *see also* 26-16 at 4.] On January 13, 2015, chiropractor Dr. Gary Kostek examined Moscato, found limitations in cervical range of motion as noted in the above table, and found a causal relationship between the limitations and the motor vehicle collision. [26-17 at 5.] On March 24, 2015, Dr. Kostek found similar limitations and clarified that Moscato "does have significant pre-existing degenerative changes in the cervical spine which in my opinion were aggravated as a result of this accident and have contributed to a delayed recovery." [26-18 at 4.] Chiropractor Dr. Steven Novelli also found cervical limitations as noted in the table above, plus a positive Spurling test. "These objective findings and confirmed limitations are a direct result of the motor vehicle accident of March 20, 2013. As a result of the forces of the motor vehicle accident, DEBORAH MOSCATO, suffered

virtually instantaneous compression, tension, shearing and rotational forces converging in a rapid sequence. This instantaneous injury prevented the body from having any reaction time to defend itself from the forces of the collision." [26-20 at 5.]

At this point, the Court should take note of additional examinations, including one in the table above, that are a major part of defendant's arguments. On June 20, 2003, roughly 10 years before the motor vehicle collision in this case, Moscato went to see Dr. Joseph Kowalski for an orthopedic examination concerning neck complaints. [30-2 at 1–3.] Dr. Kowalski found a positive Spurling test. [*See also* 36 at 12 ("Chiropractor Novelli alleges that Spurling's test, which is used to evaluate nerve root pain, was positive in both 2014 and 2016. Dkt. # 26-20, ¶¶ 3, 10. However, plaintiff exhibited a positive Spurling's test in 2003–ten years before the accident. USA SUF, Exh. B, p. 2. Needless to say, this fact is not even mentioned in Chiropractor Novelli's declaration.").] Dr. Kowalski also found left and right cervical rotation of 60 degrees. Dr. Kowalski diagnosed Moscato with osteoarthritis of her cervical spine with residual stiffness. A medical progress note in defendant's motion papers, dated July 10, 2013, notes a history of cervical arthritis for Moscato and a qualitatively recorded decrease in range of cervical motion. [30-3 at 1.] On November 23, 2016, Dr. Elliott Gross examined Moscato and found quantitative cervical limitations as noted in the table above. Dr. Gross downplayed the quantitative limitations with a comment that subtly accused Moscato of malingering:

> Today's neurological examination was normal. There were no neuromuscular deficiencies. Although her range of motion was somewhat limited, and was measured objectively, range of motion is a function of effort and is considered subjective.

[30-8 at 3.] On December 5, 2016, Dr. John Leddy examined Moscato. Dr. Leddy found

8

limitations in Moscato's cervical range of motion as noted in the table above. Dr. Leddy reviewed

other evidence in the case as well and reached this conclusion on May 10, 2017:

> The medical evidence in this case, which is based upon Ms. Moscato's
> objective physical examination on 12/5/16, the evidence in the medical records,
> and upon my visualization of the diagnostic studies and the video, confirms that
> Ms. Moscato may have at most sustained a cervical muscle strain in the accident on
> March 20, 2013, but even that diagnosis is questionable given the 4 month delay in
> seeking medical treatment. The almost 4 month delay in seeking medical
> evaluation is a large gap in treatment that is certainly not consistent with a serious
> injury. A cervical muscle strain is not a serious injury; it is self-limiting and the
> medical records in this case demonstrate that it resolved with time and conservative
> treatment. Her objective spinal and neurological examinations and her nerve
> conduction study never showed evidence of traumatic disc herniation, neurological
> deficit or of cervical radiculopathy. Her cervical MRIs and x-rays reveal chronic
> degenerative disease that long pre-dated this incident. There is no evidence of
> traumatic injury as a result of a 3/20/13 accident on her diagnostic studies, which
> was also confirmed by the neurosurgeon. Her past medical records clearly
> document that she had chronic neck pain dating back to the year 2003 when she
> was diagnosed with cervical arthritis by a spine surgeon. Therefore, her pre-existing
> cervical degenerative disease was symptomatic as far back as the year 2003. Her
> range of motion on examination is consistent with her pre-existing diagnosis of
> cervical arthritis. Her current objective physical examination is consistent with
> degenerative cervical arthritis (i.e., mild reduction of subjective cervical motion).
>
> According to the objective medical evidence, she has recovered from the
> possible cervical muscle strain since her physical examination now demonstrates no
> muscle spasm, muscle atrophy, neurological deficit or physical examination
> evidence of cervical radiculopathy.
>
> There is therefore no medical evidence that the 3/20/13 car accident
> directly caused traumatic cervical disc herniations. After the cervical strain
> resolved, her symptoms, physical examination and diagnostic studies are all
> consistent with her chronic degenerative and previously symptomatic cervical
> arthritis that predated the accident by more than 10 years. The accident did not
> cause a significant or permanent aggravation of this condition.

[30-10 at 5–6.] [*But see* 37 at 2 ("Dr. Leddy's report does admit that Ms. Moscato may have

sustained a cervical muscle strain in the accident of March 20, 2013, though he finds that

diagnoses 'questionable' because of a purported delay in treatment. [Dkt#30-10]. However, he does not appear to have been aware that she attempted massage therapy during what he perceived to be an alleged 'gap' in treatment. [Dkt #30-10 and Dkt#26-7, p. 6, 7]. The fact is that she was receiving treatment during that time period for the injuries sustained in the collision and Dr. Leddy's predicator 'facts' are wrong.").]

Dr. Leddy's assessment made reference to video footage that he reviewed; the video footage in question came from surveillance that defendant conducted of Moscato in March and April 2017. Dr. Leddy described the video footage as follows:

On May 9, 2017 I visualized a video and reviewed a summary of her deposition transcript: she is observed on 3/30/17 to be walking with another woman downtown. She is moving her head and neck fluidly, to the right and left, and up and down, without any pain behaviors demonstrated. She is observed to be standing comfortably for a long period of time. On 4/10/17 she is outside her house sitting with her husband (I presume) and is observed to be moving her neck all over, up and down, right and left, bending over to pick things up, putting lotion on her legs, all the while moving her head and neck with no apparent discomfort whatsoever. She puts her socks on without any limitation. Some of her neck movements are rather sudden but there is no demonstration of limitation or of pain in her face. Later on she is observed to be talking with a neighbor and she is standing for a long period of time. Throughout the rest of that day's video she is observed to be moving her neck repeatedly up and down, right and left, without evident pain, walking through the neighborhood with her husband and, I presume, her grandchild (who is on a bike), going in and out of the house, all with fluid motions and no limitations. At one point she is observed to be carrying a leaf blower. Video taken on 4/13/17 shows that she is sitting in her car, looking down and then to the left for a long time, without any evidence of limitation. Later on she is observed riding in her husband's Jeep. She goes into a store, comes out with a package, is walking normally; and gets back into the Jeep and her husband drives off.

In the summary of her deposition transcript, she testified that she had limitations with all movements of her neck, limitations on standing, lifting, and on riding in her husband's Jeep. I observed no evidence of any limitation to these specific activities on the provided video.

[30-10 at 4–5.] A few months later, on August 14, 2017, Dr. Leddy reiterated his prior assessment of the case but added an indirect comment on Moscato's good faith and credibility:

> The opinions of the above experts notwithstanding, there is no medical evidence that Ms. Moscato sustained anything more than a possible mild cervical muscle strain in the accident on March 20, 2013. The medical evidence confirms that she has fully recovered from the strain. She did not seek medical treatment for 4 months after the accident and therefore is not possible [*sic*] that she had aggravation of prior degenerative disease, new disc herniations, or anything more than a mild cervical muscle strain that resolved. There is no medical reason that she could have sustained a significant injury in the 3/20/13 accident since *any reasonable person* would have sought medical treatment much, much earlier than she did.

[30-11 at 2 (emphasis added).] Defendant has gone into great detail to describe what it believes is appearing on screen in the video footage. [32 at 6–12.] Moscato has contested defendant's descriptions of the video footage as inaccurate or taken out of context. [37-3 at 3–5.] The Court will address the video footage more below.

### C. Administrative Prerequisites

Prior to commencing litigation, Moscato attempted to address any claims administratively. Moscato prepared a damage claim form using Department of Justice Form 95. [26-2 at 2.] Moscato signed the form on November 13, 2014 and served it on ICE on March 11, 2015. [26-2 at 4.] In a letter dated December 2, 2015, ICE denied Moscato's claim. [26-2 at 5.] Moscato's counsel received the denial letter on December 11, 2015. [*Id.*]

### D. This Litigation

Moscato commenced this case by filing her complaint on December 18, 2015. [1.] Defendant answered the complaint on March 2, 2016. [7.] The complaint contains a single claim of negligence against defendant based on Haggerty's collision with Moscato. In the complaint,

Moscato accused Haggerty of various actions constituting negligence, including failure to keep his vehicle under control and failure to brake properly. [1 at 4.] Moscato accused Haggerty also of violating New York State Vehicle and Traffic Law Section 388. [*Id.*] Moscato made a demand of "actual damages" of $2 million, plus costs. [*Id.* at 5.][5]

## III.   DISCUSSION

### A.  *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

---

[5] Moscato also demanded a jury trial, but the United States has waived sovereign immunity only for bench trials in tort cases. *See* 28 U.S.C. § 2402 (with exceptions not relevant here, "any action against the United States under section 1346 shall be tried by the court without a jury").

When assessing summary judgment motions, courts can assess the record only for triable issues of fact; they cannot assess the underlying substance. "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted); *see also Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.") (internal quotation marks and citation omitted). Disputes about credibility must rest on specific events or other evidence in the record. "Although witness credibility is usually a question of fact for the jury, broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact for trial. A plaintiff opposing summary judgment must still identify affirmative evidence from which a jury could find that the plaintiff has carried her burden of proving the pertinent intent." *Desia v. GE Life & Annuity Assur. Co.*, 350 F. App'x 542, 544–45 (2d Cir. 2009) (summary order) (internal quotation and editorial marks and citations omitted).

### B. Liability

New York's general standard for negligence is straightforward and familiar. "In short, a court always is required to undertake an initial evaluation of the evidence to determine whether the plaintiff has established the elements necessary to a cause of action in negligence, to wit: (1) the

existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the

plaintiff as a result thereof." *Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 535 (N.Y. 1981)

(citation omitted). Moscato's argument for summary judgment on liability is straightforward:

> As is set forth in Plaintiff's statement of undisputed facts, this action arises
> out of a motor vehicle accident which occurred on March 20, 2013. The Plaintiff's
> vehicle while stopped at a red light was struck in the rear by the Defendant's
> vehicle. A rear-end collision with a stopped or slowing vehicle establishes a *prima
> facie* case of negligence as against the driver of the rear vehicle. *See: Ruzycki v. Baker*,
> 301 A.D.2d 48 (4th Dept. 2002).

> Not only does a rear-end collision with a stopped or stopping vehicle create
> a *prima facie* case of negligence with respect of the operator of the moving vehicle,
> but it also shifts the burden of coming forward with proof in evidentiary form to
> the operator of the moving vehicle to rebut the inference of negligence by
> providing a non-negligent explanation for the collision. *See Brooks v. High Street
> Professional Bldg., Inc.*, 34 A.D.3d 1265 (4th Dept. 2006); *Chepel v. Meyers*, 306
> A.D.3d 235, 237 (2nd Dept. 2003); *Suitor v. Boivin*, 219 A.D.2d 799, 800 (4th
> Dept. 1995).

> The record is absent of any excuse. The driver of the vehicle testified that
> he didn't brake on time and struck the Moscato vehicle in the rear. The driver's
> collision with the rear of Plaintiff's vehicle is negligence as a matter of law.

[26-25 at 2.] Defendant has made other arguments in favor of its own motion for summary

judgment, but it has not challenged liability in itself. Challenging liability would appear not to be

possible here; the rear-end nature of the collision created a *prima facie* case of negligence, and the

Court sees no mitigating factors that would at least create a question of fact for a factfinder. *See,

e.g., Tutrani v. Cty. of Suffolk*, 891 N.E.2d 726, 727 (N.Y. 2008) ("It is well settled that a rear-end

collision with a stopped vehicle establishes a prima facie case of negligence on the part of the

driver of the rear vehicle.") (citation omitted); *Karademir v. Mirando-Jelinek*, 59 N.Y.S.3d 454, 456

(App. Div. 2017) ("A rear-end collision with a stopped vehicle establishes a prima facie case of

negligence against the operator of the moving vehicle and imposes a duty on the latter to provide evidence of a nonnegligent explanation for the collision in order to rebut the inference of negligence."). The Court accordingly recommends granting Moscato's motion with respect to liability.

### C. Serious Injury

Under New York law, Haggerty's negligence and defendant's resulting liability are not the end of the story. Moscato has to cross certain thresholds with respect to damages. For non-economic damages (*i.e.*, pain and suffering),[6] the threshold is New York's definition of a "serious injury." "Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury . . . ." N.Y. Ins. Law § 5104(a) (McKinney and Westlaw 2018). "Once a jury determines that plaintiff has met the threshold for serious injury, the jury may award damages for all of plaintiff's injuries causally related to the accident, even those not meeting the serious injury threshold." *Judd Rubin v. SMS Taxi Corp.*, 898 N.Y.S.2d 110, 112 (App. Div. 2010). The Insurance Law sets forth a number of ways to establish a serious injury; of those, Moscato has chosen to focus on the following two:

- Permanent consequential limitation of use of a body organ or member; or

- Significant limitation of use of a body function or system.

---

[6] "'Non-economic loss' means pain and suffering and similar non-monetary detriment." N.Y. Ins. Law § 5102(c).

*Id.* § 5102(d). More specifically, Moscato has made the following arguments to support summary judgment as to the issue of serious injury:

> For these two statutory categories, it has been held that whether a limitation of use or function is significant or consequential (i.e., important ***) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part. *Toure v. Avis Rent a Car Sys.*, 98 NY2d 345, 353, 746 NYS2d 865, (2002). The plaintiff must show objective proof of the injury. To show the limitation, the numeric percentage of Plaintiff's loss of range of motion can be given or the physician can provide a qualitative assessment of the Plaintiff's condition provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body, organ, member, function or system. *Id.*

> Here, Dr. Novelli, Dr. Cicchetti, Dr. Hausmann and Dr. Kostek have all opined on and measured the cervical spine restrictions suffered by Mrs. Moscato and have causally related those restrictions to the motor vehicle collision of March 20, 2013. Dr. Hausmann's physical examination of her cervical spine showed that she had 45° in right and left rotation (normal 80°); 35° in flexion (normal 50°); 45° in extension (normal 60°). She had tenderness in the trapezials. Her shoulder range of motion remained limited with 130° of abduction and 150° of flexion on each side. Dr. Cicchetti affirmed that Mrs. Moscato exhibited a 25% restriction in the range of motion of her cervical spine in all directions, a reduced sensation at the C6 dermatome and increased neural tension of the left arm on adverse neurodynamic tension testing and positive findings on the Spurling's test and a positive upper abduction relief sign on the left.

> Dr. Novelli opines that Deborah's specific reports of inability/difficulty to perform activities of daily living were not unexpected as her clinical examination and objective physical findings confirmed said findings. Dr. Novelli affirms to the loss of range of motion and spasming muscles and considered her 50% disabled and limited her to no overhead lifting and no lifting over 10 pounds in August of 2016.

> All these complications and limitations are all natural and expected consequences which stem from the injuries Mrs. Moscato has sustained as a result of the automobile accident of March 20, 2013.

> Other objective positive findings affirmed to by Dr. Novelli included the S[p]urling's test which was positive in the cervical, upper thoracic, left posterior

shoulder and right posterior shoulder region, Soto Hall test was positive in the cervical and upper thoracic region. Cervical Compression test was positive in the cervical region. Apley's scratch test was positive on the left in the left posterior shoulder region. O'Donahues test was positive on the left and in the left posterior shoulder and left anterior shoulder region and O'Brien's Test was positive with an increased in pain noted in the left posterior shoulder, left anterior shoulder and left cervical region. In addition he continued to personally observe tenderness to palpation and spasms and extremity joint dysfunction was discovered in the left scapulothoracic region and shoulder. See Declaration of Dr. Stephen Novelli dated August 4, 2017.

A Plaintiff must also demonstrate that these limitations are "something more than ... a minor, mild or slight limitation of use." *Licari v. Elliott*, 57 NY2d 230, 455 NYS2d 570 (1982). These significant limitations and the reduced range of motion in her cervical spine affect her ability to fully engage in her activities of daily living and in fact was the main reason she sought an early retirement from her position as a paraplanner. Her testimony is: "I cannot do any activities that would require you to raise your head up to look to the ceiling. So that includes lifting things up, bringing things down, doing vacuuming of the ceiling. I'm limited as to the amount that I can look down for any extended period of time. So standing and looking down, which would be cooking. Just activities like the Christmas tree. It takes me two days to do the Christmas tree now. I can't reach up and keep on moving. All those movements just irritate my neck. I can't play games on the floor. Baking cookies. I couldn't do that at Christmas time. I can't look down. Doing any extended sitting, standing, moving. Crossing the street, I'm very cautious because my neck does not go left very well." [Declaration of Deanna D. Russell, Esq at Ex. "F"].

These limitations are more than minor, mild or slight. This collision has significantly affected Mrs. Moscato's ability to fully participate in her life as she once had.

[26-25 at 3–5.] [*See also* 40-1 at 4–5 ("As a result of the forces of the motor vehicle collision,

DEBORAH MOSCATO, suffered virtually instantaneous compression, tension, shearing and

rotational forces converging in a rapid sequence upon a spine with documented degenerative

changes. The collision caused degenerative conditions to become symptomatic and new damage

to her cervical spine in the form of the ligament laxity damage and the cervical herniation at C6-7

leading to a reduced range of motion, restrictions in her ability to carry out her daily activities and

pain symptoms.").]

Defendant addresses Moscato's claim of a permanent consequential limitation as follows:

> In order to establish a "serious injury" on the basis of a "permanent consequential limitation of use or significant limitation of use of a body organ, member, function or system", a plaintiff must establish that the injury was both permanent and resulted in significant physical limitations. *Pommels*, 4 N.Y.3d at 574 (2005). "A claim of permanent loss of use of a bodily function or system must be supported by medical records, and may not be based solely on plaintiff's testimony and subjective complaints of pain." *Jones v. United States*, 408 F. Supp. 2d 107, 117 (E.D.N.Y. 2006).[7]

> In this regard, it is significant that in the treatment records, none of plaintiff's physicians describe the injuries allegedly caused by the accident as "permanent". The Government is aware of no competent evidence from any medical source that any of plaintiff's injuries which resulted from the 2009 accident are permanent. *See, e.g., Lanuto v. Constantine*, 192 A.D.2d 989, 990 (3rd Dept. 1993) (no triable issue of fact regarding permanency where plaintiff's treating doctors were silent on the issue). Therefore, the medical records do not establish the existence of a permanent injury. Moreover, plaintiff cannot rely upon her pre-existing injuries–her cervical arthritis–to establish a permanent injury. *Jones*, 408 F. Supp. 2d at 107; *Houston v. Gajdos*, 11 A.D. 3d 514, 515 (2d Dept. 2004); *Frank v. Jones*, 259 A.D. 2d 517 (2d Dept. 1999).

> Dr. Leddy, who reviewed all of plaintiff's medical records, concluded that plaintiff sustained, at most, a temporary cervical strain. SUF ¶¶ 107–120; 114. While Dr. Leddy found that plaintiff had pre-existing degenerative disc disease, he concluded that the degenerative disc disease was not causally related to the accident. SUF ¶¶ 107–120. Dr. Leddy found no objective medical evidence of a permanent injury. SUF ¶¶ 107–120. Moreover, plaintiff's own experts agreed that plaintiff is not disabled, may continue to work without restriction, requires no household help or ambulatory aids, and does not require prescription medication or surgery. SUF ¶¶ 121-131. Based upon plaintiff's medical records, Dr. Leddy's report, and plaintiff's experts' own statements, the Government has established

---

[7] Between the principal and reply memoranda of law in support of its own motion [31, 39], and the memorandum of law in opposition to Moscato's motion [36], defendant cites *Jones* seven times. The Court cannot understand why, given that *Jones* is an FRCP 52 fact-finding decision following a bench trial—unless defendant is conceding the need for a bench trial here.

that plaintiff did not sustain a permanent consequential limitation of use or significant limitation of use of a body organ, member, function or system.

[31 at 8–9.] Defendant continues with this argument in response to Moscato's claim of a significant limitation:

> In cases involving herniated and bulging discs, where there is a claim of a significant limitation, plaintiffs often rely on limitations in range of motion to establish a serious injury. *Baytsayeva*, at 23. A limitation of range of motion of 20% has been deemed to be significant for summary judgment purposes. *Id.*, citing *Hodder v. United States*, 328 F.Supp. 2d 335, 356 (E.D.N.Y. 2004).
>
> In this regard, Dr. Leddy has opined that plaintiff sustained, at most, a temporary cervical strain, that she recovered from her injury and that she has no ongoing limitations as a result of the accident. SUF ¶¶ 107–120. The objective medical evidence from plaintiff's treating physicians supports Dr. Leddy's conclusion. For example, a neurologist found plaintiff's physical exam to be normal in November 2016. SUF ¶¶ 35–36. Drs. Chicchetti and Hausman also found her exam to be normal. SUF ¶ 123. Dr. Chicchetti also found that plaintiff had a minimal restriction in her range of motion with mild pain. SUF ¶ 124. It should also be noted that plaintiff had a 25% limitation in her cervical range of motion ten years before the accident due to her cervical arthritis. SUF ¶ 8. Therefore, the objective findings do not support a finding that plaintiff sustained a significant limitation of a body function or system as a result of the accident.

[31 at 10–11.] Defendant makes this additional argument about Moscato's purported inability to link any cervical limitations causally to the motor vehicle collision of 2013:

> Dr. Leddy conducted a physical examination of plaintiff and also reviewed her medical records, the deposition of plaintiff, and other documents. A copy of Dr. Leddy's report, which is affirmed under penalty of perjury, is attached to the Appendix as Exhibit J. Dr. Leddy affirmed that plaintiff sustained, at most, temporary cervical strains as a result of the accident but that plaintiff did not sustain a serious injury. SUF ¶¶ 107–120. By objective medical criteria and within a reasonable degree of medical certainty, Dr. Leddy concluded that plaintiff recovered from the temporary strains which she may have sustained as a result of the accident and does not require any further medical or surgical treatment with respect to the muscle strains. SUF ¶¶ 107–120. The IME performed by Dr. Leddy did not reveal any objective medical evidence of persisting symptoms, limitations, disability or permanency stemming from the accident. SUF ¶¶ 107–120. Overall,

Dr. Leddy attested that plaintiff's prognosis with respect to the accident was and is good and that the injuries alleged emanate from preexisting conditions. SUF ¶¶ 107–120. In conjunction with the detailed review of plaintiff's medical records and past medical history, Dr. Leddy explained the basis of his opinions in detail.

> *First*, Dr. Leddy noted plaintiff's documented history of cervical arthritis prior to this accident. SUF ¶ 116.

> *Second*, diagnostic x-ray and MRI studies of plaintiff's back and neck revealed degenerative disease in her cervical spine that the objective medical records confirm was symptomatic. SUF ¶ 116.

> *Third*, Dr. Leddy confirmed that plaintiff's degenerative disease is not causally related to the accident. SUF ¶¶ 111–120.

> *Fourth*, Dr. Leddy opined that there was no objective evidence of a traumatic fracture or disc herniation as a direct result of the accident. SUF ¶¶ 111-120.

> Coupled with the absence of countervailing objective medical evidence, Dr. Leddy's conclusion that plaintiff did not suffer a serious injury as a result of the accident warrants dismissal of the complaint.

[31 at 11–12.]

A review of the motion papers quickly makes apparent that the parties view the pertinent medical records very differently. A review of the basic rules governing these different views is warranted. Courts often wrestle with "the sometimes frustrating task of deciding when evidence presented on a motion for summary judgment meets the 'serious injury' threshold, an elusive standard that all too frequently escapes facile and final resolution." *Brown v. Achy*, 776 N.Y.S.2d 56, 57 (App. Div. 2004) (citation omitted). New York courts nonetheless have crafted some important guidelines. "In order to prove the extent or degree of physical limitation, an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury. An expert's *qualitative* assessment of a plaintiff's condition

also may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." *Toure v. Avis Rent A Car Sys., Inc.*, 774 N.E.2d 1197, 1200 (N.Y. 2002) (citations omitted). Disc herniations by themselves do not suffice to cross the threshold, but herniations supported by an objective expert affidavit will suffice. *Compare, e.g., Coward v. Delgado*, 800 N.Y.S.2d 344, 2005 WL 465165, at *6 (N.Y.C. Civ. Ct. 2005) (granting a defense motion for summary judgment where "a diagnosis of a bulging or herniated disc in and of itself does not constitute a 'serious injury' as contemplated in section 5102(d) of the Insurance Law") (citations omitted) *with Fabiano v. Kirkorian*, 761 N.Y.S.2d 288, 289 (App. Div. 2003) (denying a defense motion for summary judgment where "the plaintiff, who has a herniated disc, submitted, among other things, an affirmation of his orthopedist which specified the decreased range of motion in his lumbar and cervical spines, and explained that his injuries are permanent and causally related to the motor vehicle accident. The orthopedist's opinion, supported by objective evidence, was sufficient to raise a triable issue of fact.") (citations omitted). A finding of a serious injury is a prerequisite for damages but not a conclusive finding as to what any award for damages should be. *See Van Nostrand v. Froehlich*, 844 N.Y.S.2d 293, 300 (App. Div. 2007) ("We hold . . . that serious injury is quintessentially an issue of damages, not liability. In the event a plaintiff at a damages trial fails to sustain the burden of establishing serious injury, the plaintiff is not entitled to any recovery despite proof of common law liability. If the serious injury threshold is established by a plaintiff at a damages trial, the jury will render a monetary award that fairly and justly compensates the plaintiff for all loss.") (citations omitted); *Kreuzer v. Edward S. Gordon Co.*, 526

N.Y.S.2d 1, 2 (App. Div. 1988) ("Once the jury found that plaintiff had not suffered a 'serious injury,' there was no right of recovery for non-economic loss.").

With the basic rules in mind, the Court returns to the medical records that the parties have submitted. No doctor who ever examined Moscato disputed that she has disc herniations at C5-6 and C6-7. The table that the Court prepared above reveals that every doctor who ever examined Moscato found some deviation from a full cervical range of motion. Some of the measurements put Moscato at cervical flexion of around 30 degrees; cervical extension of around 20 degrees; and lateral bending of around 20 degrees. *Cf., e.g., McCarthy v. Perault*, 716 N.Y.S.2d 463, 465 (App. Div. 2000) (reversing summary judgment for defendant and ordering a trial, where plaintiff had the same cervical measurements). Even Dr. Castiglia found limitations in August 2016; his October 2016 examination showing full motion is an outlier in the table. Over the last 12–18 months, doctors who examined Moscato found differing amounts of reduction in her cervical range of motion, from as little as about 10% up to 20% or more. *See, e.g., Hodder v. United States*, 328 F. Supp. 2d 335, 356 (E.D.N.Y. 2004) (collecting cases and noting that "[w]hile there is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes"). "Defendant's own submissions, particularly the report of Dr. Leddy, contain documentation and quantification of consequential and significant limitations in the range of motion of Plaintiff's cervical spine as well as positive objective findings upon the MRIs." [37-2 at 3.] Dr. Kowalski took very few measurements in 2003, and compared to the measurements that he did take for cervical rotation, most of Moscato's measurements after

22

the collision are significantly lower.  The differences in pre-collision and post-collision measurements, noticeable in the table that the Court prepared above, create a question of fact about exacerbation of pre-existing injuries and distinguish Moscato's case from a major case that defendant has cited.  *See Skolen v. United States*, No. 12-CV-515(LJV)(LGF), 2017 WL 1472909, at *4 (W.D.N.Y. Apr. 25, 2017) ("Mr. Skolen's evidence falls short when it comes to differentiating between his pre-existing condition and the 'serious injuries' that he claims resulted from the October 8, 2009 collision.").  The definition of normal range of motion can vary from provider to provider, and from patient to patient, and can also become a fact question.  *Compare, e.g., Satterfield v. Maldonado*, 127 F. Supp. 3d 177, 186 n.6 (S.D.N.Y. 2015) ("Mr. Vaneden's neck flexion was 35 degrees (Dr. Gaughan noted that 50 degrees is normal), extension was 40 degrees (60 degrees is normal), neck rotation to the right was 30 degrees and to the left was 45 degrees (normal rotation bilaterally is 90 degrees), and lateral bending to the right and left was 25 degrees (40 degrees is normal).") *and Jun Suk Seo v. Walsh*, 918 N.Y.S.2d 146, 147 (App. Div. 2011) ("Dr. Gutstein concluded that the flexion of the cervical region of the plaintiff's spine was 45 degrees, with 75 degrees being the normal range of motion; his extension was 10 degrees, with 30 degrees being normal; and his rotation was 25 degrees, with 45 degrees being normal.") *with Percik v. Ustundag*, 918 N.Y.S.2d 399, 2010 WL 45956882010 (Sup. Ct. 2010) (table case) ("Range of motion testing on the cervical spine revealed flexion 50 degrees (50 normal), extension 60 degrees (60 normal), right and left flexion 45 degrees (45 normal), right and left rotation 80 degrees (80 normal).").  Whatever the ultimate resolution might be for all these numerical discrepancies, the measurements suggest enough of an impairment to send the issue to a factfinder for that

resolution. Additionally, even where they differ about severity, the medical records are nearly unanimous in showing that Moscato has some kind of qualitative symptomology related to pain and stiffness in her neck. *Cf. Cook v. Peterson*, 28 N.Y.S.3d 501, 506 (App. Div. 2016) ("Defendants' own submissions established that plaintiff sustained, at the very least, cervical and lumbar sprains/strains, which resulted in a moderately limited range of motion. Any assessment of the significance of a bodily limitation necessarily requires consideration not only of the extent or degree of the limitation, but of its duration as well. Here, defendants failed to establish as a matter of law that the limitations sustained by plaintiff from the cervical and lumbar sprains and strains were not significant. In any event, as with the permanent consequential limitation of use category, we agree with plaintiff that he raised triable issues of fact whether the occipital neuralgia was caused by the accident and, if so, whether that injury caused a significant limitation of use of plaintiff's musculoskeletal system.") (internal quotation and editorial marks and citations omitted). Where a sharp dispute arises concerns causation and confounding variables. How much of Moscato's present quantitative and qualitative status comes from the motor vehicle collision, and how much comes from chronic arthritis diagnosed as far back as 2003? The Court does not want to reduce the issue of causation to a boxscore, but it cannot ignore that four medical providers—Cicchetti, Hausmann, Kostek, and Novelli—all have stated explicitly that at least some of Moscato's quantitative and qualitative symptoms resulted from the motor vehicle collision. *Cf. Moat v. Kizale*, 52 N.Y.S.3d 554, 559 (App. Div. 2017) (question of fact regarding "exacerbation of [plaintiff's] preexisting degenerative disc disease of the lumbar spine" caused by a motor vehicle collision); *Smith v. Cornell*, 947 N.Y.S.2d 696, 697–98 (App. Div. 2012) ("One of

the physicians determined that plaintiff had significant limited range of motion of the cervical spine and shoulders and that 50% of the limitation was attributable to the accident and the other 50% was attributable to rheumatoid arthritis, which had been dormant prior to the accident but became symptomatic as a result of the accident. Upon a further examination approximately two years later, that physician determined that 25% of plaintiff's limitations, which had increased, were attributable to the accident and that 75% were attributable to the ongoing progression of the disease. The second physician agreed with plaintiff's treating orthopedic surgeon that surgery was necessary to correct bilateral ulnar impaction syndrome, 100% of which was attributable to the accident. We therefore conclude that plaintiff presented objective medical evidence of her injuries and resulting limitations sufficient to defeat the motion with respect to the significant limitation of use category of serious injury."). Two medical providers—Leddy and Gross—have stated otherwise. The providers have reached their conclusions based on direct examinations, existing medical records, their training, and their experience. Resolving causation as a matter of law is impossible under these circumstances. *Cf. Cook*, 28 N.Y.S.3d at 505 ("Those conflicting expert opinions create triable issues of fact requiring a trial. Indeed, it is well established that conflicting expert opinions may not be resolved on a motion for summary judgment.") (internal quotation and editorial marks and citations omitted); *Pietropinto v. Benjamin*, 961 N.Y.S.2d 461, 463 (App. Div. 2013) (creating a triable issue of fact as to causation through a physician affirmation describing trauma).

Defendant's detailed factual analysis of the surveillance video footage only deepens the questions that a factfinder will have to resolve at trial. Here is a sample of how much minute-by-

minute factual detail defendant would have the Court adjudicate as a matter of law:

Surveillance Video # 1 on March 30, 2017 at approximately 1:05, plaintiff sharply turns her head to the left. Exh. N.

Surveillance Video # 1 on March 30, 2017 at approximately 2:32, plaintiff turns her head to the left. Exh. N.

Surveillance Video # 1 on March 30, 2017 at approximately 13:11, plaintiff first turns her head to the right and then to the left. Exh. N.

Surveillance Video # 1 on March 30, 2017 at approximately 16:10, plaintiff first turns her head to the left and then to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 00:18, plaintiff turns her head to the left. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 00:23, plaintiff turns her head to the left. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 5:56, plaintiff turns her head sharply to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 6:24 to 7:58, plaintiff is observed looking down while rubbing lotion on her legs and putting on one sock with her head turning from right to left and up and down nearly the entire time; plaintiff makes particularly sharp turns of her head to the left at 6:52 and 7:56. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 9:40, plaintiff turns her head sharply to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 11:23 to 20:23, plaintiff is observed standing while talking to a neighbor while turning her head to the right and left throughout the conversation; plaintiff makes particularly sharp turns of her head at 15:39, 16:15, 17:09, 17:30, 17:56, 18:43, 18:48, 19:40, 20:09, and 20:12. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 25:14, plaintiff turns her head sharply to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 25:29, plaintiff turns her head sharply to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 25:38, plaintiff turns her head sharply to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 25:42, plaintiff turns her head sharply to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 32:55, plaintiff turns her head to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 33:00, plaintiff turns her head to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 33:06, plaintiff turns her head to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 33:18, plaintiff turns her head to the right. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 44:46, plaintiff turns her head to the left. Exh. N.

Surveillance Video # 4 on April 13, 2017 at approximately 00:03, plaintiff turns her head to the left to look out her driver's side window while sitting in her parked car. Exh. N.

Surveillance Video # 4 on April 13, 2017 from approximately 00:17 to 00:32, plaintiff turns her head to the left to look out her driver's side window while sitting in her parked car. Exh. N.

Surveillance Video # 4 on April 13, 2017 from approximately 1:02 to 1:12, plaintiff turns her head to the left to look out her driver's side window while sitting in her parked car. Exh. N.

Surveillance Video # 4 on April 13, 2017 from approximately 1:16 to 1:24, plaintiff turns her head to the left to look out her driver's side window while sitting in her parked car. Exh. N.

Surveillance Video # 4 on April 13, 2017 from approximately 1:36 to 3:27, plaintiff turns her head to the left to look out her driver's side window while sitting in her parked car. Exh. N.

In her deposition testimony, plaintiff stated that: "I'm limited as to the amount that I can look down for any extended period of time. So standing and looking down .... I can't look down." Exh. A, 64–65.

Surveillance Video # 1 on March 30, 2017 at approximately 7:40 and again at 9:39, plaintiff is observed standing while looking down. Exh. N.

Surveillance Video # 1 on March 30, 2017 from approximately 11:04 to 11:16, plaintiff is observed standing while looking up and down repeatedly as she converses and checks her telephone. Exh. N.

Surveillance Video # 1 on March 30, 2017 from approximately 11:16 to 11:48, plaintiff is observed standing while looking down at her telephone. Exh. N.

Surveillance Video # 1 on March 30, 2017 at approximately 13:18, plaintiff is observed standing while looking down into her purse. Exh. N.

Surveillance Video # 1 on March 30, 2017 from approximately 13:22 to 14:12, plaintiff is observed standing while looking down at her telephone and then some papers. Exh. N.

Surveillance Video # 3 on April 10, 2017 at approximately 1:50, plaintiff looks down. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 2:32 to 3:43, plaintiff looks down while putting on socks and sneakers. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 5:39 to 5:51, plaintiff is observed standing while looking down. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 6:24 to 7:58, plaintiff is observed looking down while rubbing lotion on her legs and putting on one sock with her head turning from right to left and up and down nearly the entire time. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 9:47 to 10:34, plaintiff looks down while putting on socks and sneakers. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 6:24 to 7:58, plaintiff is observed looking down while rubbing lotion on her legs and putting on one sock with her head turning from right to left and up and down nearly the entire time. Exh. N.

At her deposition, when asked about her restrictions, plaintiff testified that she is restricted from "[d]oing any extended sitting, standing, moving." Exh. A, p. 65.

Surveillance Video # 1 on March 30, 2017, plaintiff is observed standing from approximately 3:21 of the video to approximately 15:50 of the video. Exh. N.

Surveillance Video # 3 on April 10, 2017 from approximately 11:23 to 20:23, plaintiff is observed standing while talking to a neighbor. Exh. N.

In her interrogatory answers, plaintiff stated that: "She is unable to ride comfortably in her husband's 2001 Jeep Wrangler for any length of time because of the jarring. The backseat does not have a high enough head rest such that she is unable to sit there at all." Exh. I.

Surveillance Video # 4 on April 13, 2017, plaintiff is observed entering the Jeep as a passenger at 5:22. Exh. N.

Surveillance Video # 5 on April 13, 2017, plaintiff is observed entering the Jeep as a passenger at 00:30. Exh. N.

In her interrogatory answers, plaintiff stated that: "She is limited in the amount of weight that she can lift." Exh. I.

Surveillance Video # 3 on April 10, 2017 at approximately 40:04, plaintiff is observed carrying a leaf blower. Exh. N.

[32 at 6–12.]

The Court has reviewed the video footage submitted with defendant's motion papers, putting aside the procedural issue that the footage has been submitted only with an attorney affirmation and has not been authenticated. *See* FRCP 56(c)(4) ("An affidavit or declaration used to support or oppose a motion *must be made on personal knowledge*, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") (emphasis added); *cf. McHugh v. Marfoglia*, 885 N.Y.S.2d 550, 551–52 (App. Div. 2009) ("Defendants submitted only an attorney's affirmation and a copy of an alleged surveillance videotape, which they concede was not authenticated and thus was properly disregarded by the court."). In much of the footage, Moscato is not even on screen—she is inside what is presumably

her house, or she is inside what is presumably her vehicle, or she is obscured by passing traffic while walking in downtown Buffalo with her counsel. When Moscato is on screen, her movements appear, to this Court's untrained eye, to be inconclusive. There are some movements of the upper body including the neck but nothing that would betray a possible claim of a 20% or more reduction in cervical range of motion. The footage could be interpreted to show that Moscato is bending at the hips, legs, or knees to minimize neck movement as she moves around and enters her husband's Jeep. Without any audio in the footage, there is no way to assess whether Moscato made any comments suggesting pain while moving. While the Court understands the point that defendant is trying to make—namely, that Moscato in the video footage does not appear to be suffering in the way that the phrases "permanent consequential limitation" and "significant limitation" might suggest, the footage leaves plenty of room for interpretation of what is actually depicted. Equally important, though, for purposes of summary judgment, the Court has to keep in mind why defendant is bringing this video footage to its attention: *to impeach Moscato's credibility.* Defendant will be free at trial to attack Moscato's credibility all it wants, with as much detail as it wants. *Cf. Barry v. United States*, 133 F.3d 906, 1998 WL 29639 (2d Cir. 1998) (unpublished opinion) (affirming defense trial verdict where, *inter alia*, "the district court noted that Barry's credibility had been severely undermined by the surveillance videotapes tending to contradict her testimony") (internal quotation and editorial marks omitted); *Nguyen v. Kiraly*, 921 N.Y.S.2d 417, 419 (App. Div. 2011) (jury is free to reject medical opinions in favor of facts, including video surveillance footage, that differed from those that formed the basis of the opinions). At this stage, though, unless credibility problems become so extreme that they push

30

judgment for one side beyond the reach of a reasonable factfinder—and that has not happened here, at least not yet—they cannot be addressed as a matter of law.

Another matter that merits brief attention is defendant's attack on Moscato's good faith. As the Court cited above, Dr. Gross's records contain a comment that effectively accused Moscato of malingering. [30-8 at 3.] Defendant will be free at trial to use malingering as the explanation for any medical assessments with which it disagrees. "The issue presented by this [malingering] evidence, of course, is one of credibility, which is not for this Court to decide." *Perl v. Meher*, 960 N.E.2d 424, 429 (N.Y. 2011); *cf. Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 353 (2d Cir. 1981) ("Subjective issues such as good faith are singularly inappropriate for determination on summary judgment.") (citation omitted). Also as the Court cited above, Dr. Leddy's records contain a comment that Moscato cannot be considered "any reasonable person" [30-11 at 2] because she tried massage therapy for three months before seeking more aggressive medical attention. Moscato attempted some form of treatment immediately and then sought more aggressive medical attention in less time than is seen in cases awarding defendant summary judgment for unexplained gaps in treatment. *Cf., e.g., Perez v. Rodriguez*, 809 N.Y.S.2d 15, 17 (App. Div. 2006) (dismissal citing unexplained three-and-a-half year gap in treatment); *Toulson v. Young Han Pae*, 788 N.Y.S.2d 334, 336 (App. Div. 2004) (dismissal citing unexplained two-year gap in treatment); *see also Cruz v. Castanos*, 781 N.Y.S.2d 23, 25 (App. Div. 2004) ("To the contrary, Dr. Barnes affirmed that the findings he made in January 2002 were 'totally comparable' with the findings made and expressed in numeric percentages by another physician connected with his practice in March 2000, five days after the accident, and again in June 2000. This constitutes

evidence that the patient's impairments endured at least from March 2000 through January 2002. In any event, any so-called 'treatment gap' in Cruz's medical history goes to the weight to be given a medical opinion and is thus a question for the jury. It does not resolve or eliminate the disputed factual issue as to whether plaintiff did or did not sustain a serious injury within the meaning of the No–Fault Law.") (citations omitted). Other case law confirms that "[a] delay in examining goes to the weight to be given a medical opinion and is properly for a jury." *Manrique v. Warshaw Woolen Assocs., Inc.*, 747 N.Y.S.2d 451, 453 (App. Div. 2002) (citation omitted).

Finally, the Court should comment briefly on defendant's critique of Dr. Novelli's professional credentials. In its zeal to attack Moscato's motion and to obtain summary judgment, defendant opened up a battle of medical credentials that further underlines the need for a factfinder's help. Multiple times in its motion papers, defendant could not resist the urge to take a dig at Dr. Novelli by writing, "Chiropractor Novelli—*who is a chiropractor and not a medical doctor or a surgeon . . . .*" [36 at 13 (emphasis added); 39 at 6, 7.] This personal attack on Dr. Novelli is a rather curious one, coming from a defendant whose own Department of Labor states that "Chiropractors must earn a *Doctor of Chiropractic* (D.C.) degree and get a state license. Doctor of Chiropractic programs typically take 4 years to complete and require at least 3 years of undergraduate college education for admission." "Chiropractors," Occupational Outlook Handbook, *available at* https://www.bls.gov/ooh/healthcare/chiropractors.htm (last visited Feb. 8, 2018) (emphasis added). Defendant also has not cited to any cases that rejected or discounted otherwise acceptable evidence simply because it came from chiropractors. *Cf., e.g., Garcia v. Leon*, 896 N.Y.S.2d 21, 22 (App. Div. 2010) ("Assuming that defendants met their initial burden as to

plaintiff Jennifer Garcia, the affidavit of her treating chiropractor, taken in conjunction with her medical experts' unsworn statements and her MRI tests, raises questions as to whether her shoulder and cervical and lumbar spinal injuries are permanent or significant, and not merely preexisting, degenerative, or caused by a subsequent 2007 accident.") (citations omitted); *Ramos v. Dekhtyar*, 753 N.Y.S.2d 489, 491 (App. Div. 2003) ("The chiropractor's affidavit contained sufficient objective medical evidence to raise a triable issue on whether each plaintiff sustained a serious injury since Dr. McGowan conducted cervical/lumbar range of motions tests and designated a numeric percentage of each plaintiff's loss of range of motion, which can be used to substantiate a claim of serious injury.") (internal quotation and editorial marks and citation omitted); *Rut v. Grigonis*, 625 N.Y.S.2d 633, 633–34 (App. Div. 1995) ("The plaintiff submitted a report and sworn affidavit of her chiropractor who stated that, based upon certain tests performed during his examination and treatment of the plaintiff, it was his opinion that the plaintiff had sustained a permanent injury and a significant limitation in the range of motion of her cervical spine. The chiropractor supplied copies of computerized range of motion test results and stated that radiographic tests revealed that the plaintiff had suffered a 'wedged disc' and a 'disc degeneration' as a result of the accident. Notwithstanding the contrary opinions of the defendant's examining physicians, this evidence was sufficient to create a triable issue of fact with regard to the plaintiff's allegation that she sustained a serious injury.") (citations omitted). The world is a big place, and there are people who have debated the merits of the chiropractic profession for decades. *See, e.g., Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 356 (7th Cir. 1990) (affirming Sherman Act violations and noting that "[i]n 1963 the AMA formed its Committee on

33

Quackery ('Committee'). The Committee worked diligently to eliminate chiropractic. A primary method to achieve this goal was to make it unethical for medical physicians to professionally associate with chiropractors. Under former Principle 3, it was unethical for medical physicians to associate with 'unscientific practitioners.' In 1966, the AMA's House of Delegates passed a resolution labelling chiropractic an unscientific cult."). The Court will not comment on that debate except to note that, if defendant wishes to join it, it is welcome to do so before a factfinder. Debating the merits of one set of professional credentials versus another is inappropriate at the summary judgment stage.

### D. Economic Loss

New York's Insurance Law has a different threshold that plaintiffs must cross when they seek damages for economic loss, or "monetary detriments" in the statute's phrasing. Simply put, "there shall be no right of recovery . . . for basic economic loss." N.Y. Ins. Law § 5104(a). "'Basic economic loss' means, up to fifty thousand dollars per person of" medical expenses, lost earnings, and "[a]ll other reasonable and necessary expenses incurred, up to twenty-five dollars per day for not more than one year from the date of the accident causing the injury." *Id.* § 5102(a). "Where, as here, an injured party asserts a claim for economic loss in excess of basic economic loss, he or she need not demonstrate that a serious injury was sustained. Rather, all that is required is that such party demonstrate that his or her total economic loss actually exceeded basic economic loss." *Jones v. Marshall*, 47 N.Y.S.3d 791, 796 (App. Div. 2017) (citations omitted). When plaintiffs can show a total economic loss that exceeds basic economic loss, the amount of basic loss will be deducted from the total loss, because the Insurance Law makes basic economic loss unrecoverable.

See, e.g., *Frometa v. Diaz-Diaz*, No. 07 CIV 6372 (HB), 2008 WL 4192501, at *6 (S.D.N.Y. Sept. 11, 2008) (citations omitted); *Austin v. Meade*, 685 N.Y.S.2d 308, 309 (App. Div. 1999) (citations omitted).  Plaintiffs, however, do have to show actual losses incurred since the date of the incident in question.  *See Schultz v. Harrison Radiator Div. Gen. Motors Corp.*, 683 N.E.2d 307, 311 (N.Y. 1997).  If plaintiffs want to assert future economic losses, for events such as household services, then "future damages for loss of household services should be awarded only for those services which are reasonably certain to be incurred and necessitated by plaintiff's injuries."  *Id.*

Here, Moscato has not shown any triable question of fact, let alone any definitive evidence, that she has incurred monetary detriments beyond the threshold for basic economic loss.  Moscato did plead economic loss and actual damages in conclusory fashion in the complaint but set forth no "short and plain statement," FRCP 8(a)(2), of how she crossed the threshold.  Moscato's memorandum of law and statement of undisputed facts do not address economic loss at all. Defendant includes this argument about economic loss in its motion papers:

> The No-Fault Law provides that a plaintiff injured in a motor vehicle accident can only recover in tort the amount of "basic economic loss" exceeding $50,000.  N.Y. Ins. Law §§ 5102(a), 5104; *Ventra v. United States*, 121 F. Supp. 2d at 332.  Thus, to recover under the No-Fault Law, the plaintiff must establish that he or she incurred more than $50,000 in damages from medical expenses, lost wages, and other reasonable and necessary expenses.  *Ventra*, 121 F. Supp. 2d at 332.  Mere speculation of basic economic loss in excess of $50,000 is not sufficient. *Davis v. United States*, No. 07-CV-292, 2012 U.S. Dist. LEXIS 3360, at *14–15 (N.D.N.Y. Jan. 11, 2012)) (finding that plaintiff failed to demonstrate basic economic loss in excess of $50,000 because he did not provide evidence of past or future medical costs).

> Here, plaintiff, in her economist's expert disclosure, alleges lost wages totaling only $10,166.  SUF ¶ 132.  And, in her interrogatory answers, alleges a total of $339.30 in unreimbursed medical costs.  SUF ¶ 133.  Accordingly, plaintiff

cannot establish basic economic loss exceeding $50,000 which is a precondition under the No-Fault Law for recovering economic damages.

[31 at 13.] The Court agrees with defendant's argument. The largest actual loss that appears in the record consists of $10,166 of claimed lost earnings, presented on a one-page tabulation by Moscato's economic expert, Dr. Ronald Reiber. [30-13 at 4.] The administrative claim that Moscato submitted to ICE prior to litigation listed only the $2,261.16 of damage to Moscato's car as economic loss. [26-2 at 2.] The only other economic loss that the Court can find in the record is the $594.30 in out-of-pocket medical expenses that Moscato asserted during discovery. [26-5 at 5.] Accepting Moscato's assertions as true for summary-judgment purposes, her claimed actual economic loss falls well below the $50,000 threshold. When defendant pointed out in its papers that Moscato has not crossed the threshold for economic loss, Moscato did not address the argument in her reply papers. [*See generally* 40.] The only factor that might have rescued Moscato's claim for economic loss concerns Dr. Reiber's estimate of future lost household services. [30-13 at 5.] This single-page estimate suggests, at the top line, that Moscato is losing an average of one hour per week of household services. The estimate includes no explanation of that assertion or of any other calculations on the page. The estimate nonetheless proceeds to calculate that, over the next 10 years, Moscato will lose over $16,000 of household services if she loses 2 hours per week of household services; over $81,000 if she loses 10 hours per week; and over $195,000 if she loses 24 hours per week. The record contains no evidence at all that Moscato has incurred quantified amounts of this type of loss between the date of her collision and now, which means in turn that Moscato has presented no explanation of why any specific quantity of loss would start now. *Cf., e.g., Kihl v. Pfeffer*, 848 N.Y.S.2d 200, 205 (App. Div. 2007) (affirming a jury award for future

housekeeping services where "Kihl's vocational rehabilitation expert, Dr. Richard Shuster, testified that Kihl required a housekeeper, especially while her son was young, for approximately 20–30 hours per week, and for only 10–15 hours per week upon the son's reaching adolescence.") (citations omitted).  Future losses of household services do not have to be calculated with absolute certainty, *see Presler v. Compson Tennis Club Assocs.*, 815 N.Y.S.2d 367, 369 (App. Div. 2006) (citation omitted), but Moscato's assertions are too speculative for any reasonable factfinder to consider.  The Court thus will disregard Dr. Reiber's two larger estimates, leaving smaller estimates that are equally speculative but would not help Moscato cross the $50,000 threshold anyway.

Under these circumstances, the Court recommends granting defendant's motion with respect to economic loss.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Moscato's motion [26] in part with respect to liability and denying it in all other respects.  The Court further recommends granting defendant's motion [29] in part with respect to economic loss and denying it in all other respects.  To summarize for the sake of clarity, if Judge Vilardo adopts this Report and Recommendation then this case will proceed to a bench trial on damages only, based on Moscato's two theories of serious injury.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP

72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

\_\_/s Hugh B. Scott_____

Hon. Hugh B. Scott
United States Magistrate Judge

DATED: February 8, 2018